832 So.2d 730 (2002)
Juan Carlos CHAVEZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC94586.
Supreme Court of Florida.
November 21, 2002.
*736 Robert Augustus Harper, Steven Brian Whittington, and Jason Michael Savitz of Robert Augustus Harper Law Firm, P.A., Tallahassee, FL, for Appellant.
Richard E. Doran, Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
The opinion issued in this case on May 30, 2002, is withdrawn, and the following revised opinion is substituted in its place. We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Juan Carlos Chavez. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the judgments and sentences under review.

MATERIAL FACTS

Jimmy Ryce's Disappearance
On the afternoon of September 11, 1995, nine-year-old Samuel James ("Jimmy") Ryce disappeared after having been dropped off from his school bus at approximately 3:07 p.m. at a bus stop near his home in the Redlands, a rural area of south Miami Dade County. An extensive and well-publicized search of the area followed, but failed to locate the child.
At that time, the defendant, Juan Carlos Chavez, was living in a trailer on property owned by Susan Scheinhaus. Chavez worked as a handyman for the Scheinhaus family, and was permitted to use their Ford pickup truck to run errands or do other work for the family. As part of his duties, Chavez frequently cared for horses owned by the Scheinhaus family, but housed on property owned by David Santana, which contained an avocado grove. There was also a trailer on that property, referred to throughout Chavez's trial as the "avocado grove trailer" or the "horsefarm trailer."[1]
*737 In August or September of 1995, Mrs. Scheinhaus reported to the police several times that items (including a handgun and some jewelry) were missing from her residence. Although she suspected Chavez, she lacked evidence of his culpability. She testified at trial that, in November, she had decided to obtain the evidence required to pursue her claim. With the help of a locksmith, on December 5, 1995, while Chavez was away for the day, Mrs. Scheinhaus and her son, Edward Scheinhaus ("Ed"), entered the trailer located on her property which Chavez occupied. She found the handgunwhich she later identified in court as a gun she had purchased in April of 1989in plain view on a counter opposite the trailer door.
As Mrs. Scheinhaus continued to look inside the trailer, she discovered, in the closet area, a book bag which was partially open. Looking inside the bag, she saw papers and books. The work appeared to be in a child's handwriting, and she noticed the name "Jimmy Ryce." She also observed this name on one of the books.[2] When Mrs. Scheinhaus asked her son to look at the items, he also recognized the child's name.
As a result of this discovery, Mrs. Scheinhaus notified the FBI. When Chavez returned to the Scheinhaus residence at about 7:15 on the evening of December 6, armed FBI agents quickly surrounded and secured him. After being patted down, he agreed to go with Metro Dade Police officers, who were also present, to the station for questioning.

Chavez's Detention
Chavez was involved in a questioning process that was punctuated by regular refreshment, food, bathroom breaks and a rest period, and interspersed with two outings returning to the Scheinhaus and Santana properties in southern Miami Dade County. Although Chavez was first brought to the police station on the night of December 6, he did not sleep until shortly after midnight on December 7.[3] Detective Luis Estopinan, who was bilingual, conducted most of the questioning, although other officers also participated. Various police detectives, an FBI agent, Mrs. Scheinhaus and an independent interpreter all had opportunities to observe Chavez at various times throughout this period. Chavez was consistently described as alert and articulate during this time, and no one observed police detectives mistreating Chavez in any way throughout the period of questioning. He received repeated warnings and instructions in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and indicated that he fully understood them on four occasions during the period of interrogation.
Over the course of the interrogation, and after having been repeatedly advised of his Miranda rights and knowingly waiving them, Chavez provided several versions of his involvement in Jimmy's disappearance. As law enforcement officers engaged in a contemporaneous investigation of Chavez's changing narratives, he agreed to accompany *738 officers on two occasions to visit the horse farm property and the Scheinhaus property, where he showed them the location of the events he had recounted had transpired. On those occasions, Chavez was asked to reveal where the boy's remains were located, to permit Jimmy's family to have closure.
After the physical evidence resulting from this contemporaneous investigation totally discredited each version of events which Chavez had initially proposed, Chavez agreed to tell the truth. However, Chavez explained that, before he would disclose the location of Jimmy's remains, he wanted the officers to guarantee that he would receive the death penalty. Estopinan advised Chavez that he could not guarantee that the death penalty would be imposed. However, Chavez continued to talk, asserting that the events would not have happened had he not been sexually battered by a relative in Cuba. Estopinan told Chavez that he "felt that it was time for him to be truthful and tell us what really happened to Jimmy, and ... went back and began to ask him about Jimmy and where Jimmy was located. We wanted to find Jimmy."
A break followed this inquiry and then Chavez reiterated to Sergeant Jimenez the most recent account which he had given Estopinan. Chavez then went to the restroom for another break and, upon returning to the interview room, informed the officers that they were now going to hear the truth: "[W]hat do you want to know? I'll tell you what happened to Jimmy Ryce."
Chavez proceeded to admit to Estopinan and Jimenez that he had abducted Jimmy at gunpoint, traveled to the horse ranch, and sexually assaulted Jimmy before finally shooting him. Estopinan explained that the officers would need details from Chavez,[4] and requested permission to take a sworn statement. Chavez agreed to continue the questioning, and Estopinan and Jimenez "began to get details" about what had happened to Jimmy Ryce. At trial, Estopinan testified regarding the final version of Chavez's statement.
Chavez said that he had observed young children playing in water on his way home from Home Depot at approximately 3 p.m. Some of the boys were wearing just their underwear, and "as he saw the young boys wearing just the[ir] underwear, he took an interest in them." After observing the children, Chavez drove off, but returned a short while later, because he "still had a mental picture of what happened, meaning that he saw the young boys in their underwear by the canal bank, and decided that he wanted to take another look." Estopinan testified:
And while this is occurring, he was driving on the avenue, he sees a younghe sees a figure of a person, and then he realizes it was a young boy that he saw. At the same time he sees the young boy who later turns out to be Jimmy Ryce, again he's thinking about the young boys who are at the canal bank.
....
He said at this point he's feeling something sexual and he wants tohe iswhat he's doing, he's doing picture what he explains to me is that he has a mental picture in his mind of the young boys in the canal with their underwear and he's also picturing Jimmy Ryce the young boy, and what he does as he's driving the pickup truck in the opposite *739 direction of Jimmy Ryce, he said at the time he had with him the Scheinhaus revolver, the Taurus, .38 caliber. And he said at this time Jimmy is walking on the left side of the road, and what he did is driving on the opposite side, he begins to drive on the opposite side of the traffic and drives and stops right in front of Jimmy Ryce causing him to stop.
The minute that Jimmy stops, he stops the truck, he gets out of the truck with the gun in his hand and tells Jimmy at gunpoint, do you want to die. And Jimmy made a comment to him, no. And he told Jimmy in English to get inside the truck. And Jimmy responds by getting into the truck via the driver's side door.
Once Jimmy is inside the pickup truck, he tells him toJimmy removes his backpack and puts it between his legs and he Chavez gets into the truck with Jimmy, still holding the handgun. It's at that point he takes the revolver and he places it underneath his lap and tells Jimmy to put his head down so Jimmy wouldn't be seen by anyone. And at that point he tells me that he drives back to the horse ranch where the trailer was located.
....
He told me that Jimmy left his backpack inside the pickup truck. Once they both exit the pickup truck, both him and Jimmy at his direction they go inside the trailer that's located inside the horse ranch. He goes on to explain that once inside the trailer he tells Jimmy to sit down on the bed. Jimmy complies. And that he sits on a black office chair close to Jimmy by the entrance and he begins to talk to Jimmy, he notices that Jimmy is, he's nervous and he's scared and Jimmy begins sobbing. And while this is occurring, Jimmy began to ask him, why did you take me? And Chavez explains to him, what he does, he begins to ask, he wants Jimmy to answer his own questions, well, why do you think I took you, things to that effect. He wants Jimmy to answer his own questions. He goes on to explain that at this point he feels like doing something sexual and that he tells Jimmy to remove his clothing. He said Jimmy complied by removing his shirt, his shorts, his sneakers and he wasn't sure if Jimmy was wearing socks or not. And then Jimmy remains in his underwear only, his white underwear he believes. He goes on to tell me that at this point he gets up and he tells Jimmy to also go ahead and remove his underwear. Jimmy complies and removed his underwear. And then he tells Jimmy to lay on the bed in the trailer and Jimmy complies. Jimmy lays on his stomach on the bed. Chavez tells me that he went into the bathroom area of the trailer looking for something. And I asked him, what are you looking for. He said, I'll explain. And he told me I was looking for something like a lubricant. And then he goes into the bathroom and he finds a see through plastic container, he said, with some blue lettering on it. And then he took a sample of the contents of the container to see if it would burn, and when it didn't, he came back to where Jimmy was and he placed this, the substance or the lubricant on to Jimmy's rectum, he said, and as he was placing the lubricant on Jimmy's rectum, Jimmy is asking what are you doing. And he mentioned to Jimmy that what do you think is going to happen, things to that effect. He unzipped his pants, he exposed his penis and he inserted his penis into Jimmy's rectum.
....
He told me right after he inserted his penis in Jimmy's rectum, he again has a mental picture of the young boys in their underwear which he had seen at the *740 canal and he said that he quickly ejaculated, and once he ejaculated inside Jimmy, he said he removed himself.[5]
Chavez said that he and Jimmy then dressed and left in the truck, indicating that he had intended to leave Jimmy in the area where he had picked him up. However, upon nearing the area where he had abducted Jimmy, Chavez noticed that police cars were present. Believing "that someone had reported Jimmy missing and they were looking for Jimmy," Chavez kept Jimmy's head down in the truck and returned to the horse farm.
Estopinan testified regarding what transpired when Chavez and Jimmy returned to the horse farm:
He said once inside the trailer, Jimmy is trembling and crying. And Jimmy asked, what's going to happen to me. Are you going to kill me. He noticed that Jimmy was very frightened. And what he does, he begins to speak to Jimmy in order to calm him down.
Chavez told Estopinan that he tried to calm Jimmy down by asking him questions.[6] He then explained how he killed Jimmy:
Well, the next thing Chavez mentions happened is he heard a helicopter fly over the horse ranch. It was his opinion he believed the helicopter belonged to the police, that the police were searching for Jimmy. When he heard the helicopter flying over him, he went ahead and held Jimmy close by to him so Jimmy wouldn't go anywhere, and eventually he heard the chopper several times flying over him, and at one point he said he got up and began looking out the window to see if he could see the chopper, the helicopter that is.
And while he was looking for the helicopter, Jimmy is still close to the front entrance of the trailer. He said that Jimmy made a dash for the door, Jimmy ran for the door trying to escape. He said that he tried to reach up to Jimmy, but he got tangled on the floor of the bathroom and at that point he said he took out the revolver belonging to Mrs. Scheinhaus, he pointed the handgun in the direction of Jimmy, fired one time hitting him.[7]
He said that Jimmy collapsed right by the door and collapsed to the right by the door inside the trailer. He said after he shot Jimmy, he came up to Jimmy, he turned Jimmy around and held Jimmy in his arms and Jimmy took one last breath, he expressed it, and he said that was the last thing Jimmy did.
Chavez described that, to dispose of Jimmy's body, he found a metal barrel inside the trailer at the horse farm, and placed Jimmy's body inside the barrel. He transported the barrel containing the body from the horse farm to the Scheinhaus *741 residence, where he removed the barrel and placed it in Chavez's disabled van, which was parked in the stable area. Chavez removed Jimmy's book bag from the pickup and carried it with him to his own trailer. That night, Chavez looked at some of the note pads inside Jimmy's book bag. Chavez noticed blood on his own clothing and eventually destroyed the clothes. During the night and into the next morning, "all he could think about was what he was going to do with Jimmy's body."
Two or three days later, Chavez attempted to use a backhoe on the Scheinhaus property to dig a hole in which to bury Jimmy, but the machine did not operate properly. Chavez remained concerned, particularly when he noticed that the lid of the barrel which contained Jimmy's body had come off.
Chavez pulled Jimmy's body from the barrel onto a piece of plywood, and, from there, his remains fell to the ground. "And he said at that point he went ahead and began to dismember Jimmy's body with the use of a tool." Chavez described the tool he used to dismember Jimmy's body, and even drew a picture of the implement. He explained that it took him a while to dismember Jimmy's body, as he was becoming sick and vomiting. "[B]ut then he completes it and he places three of Jimmy's parts [into] these three planters. And once he fills these planters with Jimmy's remains, he goes ahead, goes into the stable area of the stable where the building is located and he locates some cement bags. With those cement bags he seals the tops of the planters with cement."[8]
The oral interview concluded at 10:50 p.m. on December 8. While an interpreter and a stenographer were being obtained to record a formal statement, Chavez remained in the interview room, and did not further converse with Estopinan until the interpreter arrived. Then, at 11:45 p.m., Chavez began to provide a formal statement. Estopinan, Sergeant Jimenez, and the court reporter were present as the statement was obtained. After some preliminary questions, Chavez was again advised of his Miranda rights. At this time, Chavez confirmed that he had voluntarily agreed to waive his first court appearance and that he had given the officers consent to search his property.[9]
When the statement was completed, each page of the statement was reviewed, and Chavez made any corrections he desired. He acknowledged in the statement that he was making the transcribed statement voluntarily; that no one had threatened or coerced him into making the statement; and that he had been treated well. Estopinan testified that, at the time he made his sworn statement, Chavez was "polite, cooperative and he was alert."
Marilu Balbis testified that she was the professional interpreter providing services during Chavez's sworn statement. Ms. Balbis was an independent contractor who had been an interpreter and translator for twelve years. The confession was unusually long, and Ms. Balbis had the opportunity to closely observe Chavez's demeanor.[10] *742 Chavez did not appear sleepy, and was alert.[11] At no point did the detectives give Chavez any answers.
Once the confession was finished, Ms. Balbis read each page, word by word, to Chavez to make sure that it was typed correctly. Chavez approved every page by initialing each page at the bottom. Ms. Balbis indicated that the police officers treated Chavez with courtesy, and that she did not observe them threaten or raise their voices toward Chavez.[12]

Chavez's Trial and Sentencing
Officer Michael Byrd recovered the loaded handgun from Chavez's trailer. Byrd also found a poster in Chavez's trailer bearing the likeness of Jimmy Ryce, which he processed as evidence. A box of bullets containing live ammunition, and one spent shell casing, were also found in the trailer.
Crime scene technician Elvey Melgarejo testified that, on December 8, 1995, he helped search and process a trailer on a horse/avocado farm. He searched the trailer and found "a tube of JR waterbased lubricant" on a shelf inside the trailer. Melgarejo collected a sofa cushion and part of the wood floor of the trailer just inside the front door. These items were packaged for transmittal to serology for processing. Melgarejo also traveled to the Scheinhaus property, where he noticed the three concrete-filled planters and became suspicious that they might contain a cadaver.
Fingerprint technician William Miller identified Chavez's fingerprint on the handgun recovered from his trailer. To determine whether fingerprints were present on the handgun, he placed it in a laboratory chamber in which super glue fumes were released, surrounding the handgun and adhering to the residue and oils left by any fingerprints. As a result, a fingerprint matching that of Chavez was found on the firearm. Miller testified that there were "ten points of identification throughout this fingerprint, which is only common to Chavez. It's an absolute and positive identification that his left thumb print made on the weapon."
On December 8, 1995, Miller also examined the books and notebooks found inside the book bag belonging to Jimmy Ryce.[13] He found Chavez's fingerprint on the front of one notebook found in the book bag. The fingerprint located on the interior of the notebook cover was found to "have sixteen points of identification, a positive identification, based on the left thumb print of Mr. Juan Carlos Chavez against the print which was developed on the inside cover." Another print of value was located on the textbook entitled Journeys in Science. He found "this particular print of value from this area to be made by the right middle fingerprint of Chavez. I had nine points of identification." When compared to the prints of Mrs. Scheinhaus and Edward Scheinhaus, the prints on the book bag contents did not match.
*743 Forensic serologist Theresa Merritt of the Metro Dade Police Department testified that she received items for examination on December 8, 1995. She was dispatched to the horse farm to assist crime scene personnel in attempting to determine whether blood was present. Merritt tested a twin-size mattress from the trailer, a cushion present on the bench in the trailer and a cut-out portion of the threshold area from the floor of the trailer. A scraping from the floor area produced a positive result for the presence of blood. Another sample, from a cushion in the trailer, yielded blood scrapings. (State's Exhibit 135.)
Anita Mathews, assistant director of the forensic identity testing laboratory for "LabCorp" of North Carolina, testified that she was "responsible for doing interpretation on the results of the testing that the technologists conduct." Mathews testified that they were not able to obtain a sufficient quantity or quality of genetic material from samples collected from the body of Jimmy Ryce for testing. However, DNA from the oral swab samples taken from his parents, Don and Claudine Ryce, was compared to the blood found on the floor of the trailer. This comparison produced the conclusion that the blood on the floor was extremely likely to have come from a child of Don and Claudine Ryce.[14] Two other blood samples taken from the floor of the trailer carried the same genetic characteristics. Another blood sample, taken from the cushion found in the trailer, also was consistent with having come from the biological child of the Ryces.[15]
Dr. Roger Mittleman, Chief Medical Examiner for the Dade Medical Examiner's Department, testified that, on December 9, he conducted an examination of the contents of the three planters.[16] The cement in each planter encased the remains of what appeared to be a young boy.[17] The remnants of a cement bag were in at least one of the planters.
Dr. Mittleman described the clothing found on Jimmy's body: "It was dressed in this T-shirt and had on jeans and underwear. There was one sneaker on; one sneaker was off. There were socks." The doctor then corrected himself, and stated that only one sock was found on the body.[18] The doctor testified that a body expands as it decomposes due to the *744 breakdown of material and biological processes, causing gases to expand. This process could cause a body placed in a barrel to expand to the point that a lid would be forced off or open.
The remains were significantly decomposed.[19] Using dental records from Jimmy's family dentist, a forensic dentist testified that the comparison with the jaw and teeth of the body was so strong that the "skeletal remains" were "positively identified as that of Jimmy Ryce." An X-Ray of the body cavity revealed a flattened projectile jacket that lodged in the area of the heart and "great vessels." The bullet entered at the point where the right sixth rib is located, went upward in the body, through the lung and the heart, and exited from the upper left chest. Based upon the trajectory of the bullet, the gun would have been pointing slightly upward and below the individual who was shot. However, there was no evidence on the body which would demonstrate how far away the gun was when it was fired.[20]
On December 20, 1995, Detective McColman had transported a tool known as a "bush hook," which had previously been impounded, to the medical examiner's office. Dr. Mittleman was asked to examine the bush hook to determine if its cutting characteristics were consistent with the injuries inflicted on Jimmy's body. The medical examiner noted that a number of the injuries inflicted on the body during dismemberment were consistent with having been made by the bush hook.[21] However, he also testified that it was possible that more than one instrument had been used.
Firearms examiner Thomas Quirk of the Metro-Dade Police Department Crime Laboratory testified that a .38 caliber Taurus model 85 revolver (State's Exhibit 23) was submitted for his examination after it had been processed by the fingerprint section. He also received one aluminum jacket from a projectile recovered from the body of the victim, and two .38 caliber casingsa projectile identified as having come from a red bullet box (State's Exhibit 36) and a casing that had been fired from a firearm (State's Exhibit 35). The two empty .38 caliber shell casings found in Chavez's trailer were fired from the .38 recovered from Chavez's trailer.
Quirk testified that the manufacture of the barrel and the rifling process provide microscopic differences which are transferred to the bullet during firing and which repeat, similar to a fingerprint. Also, the projectile jacket recovered by the medical examiner and the lead core (the fatal bullet) were positively identified as having been fired by the gun recovered from Chavez's trailer: "My conclusion is that this bullet was fired in this weapon to the exclusion of all other weapons in the world. This is the gun that fired this bullet."
After the State rested, Chavez moved for judgment of acquittal, which was denied. Defense counsel specifically argued *745 the State's failure to establish a corpus delicti for the crime of sexual battery. The defense then began the presentation of its case. During the examination of Ed Scheinhaus, Ed explained that he had been under house arrest at the time the kidnaping occurred. He worked from 10 p.m. to 6 a.m., and was required to stay at home at all other times, unless he arranged in advance to be away from his house. He had an ankle device, and would be called each day at random times (as controlled by a computer) throughout the period he was confined to his home. When called, he would have to "report in" by placing the ankle bracelet next to a device installed in his home.
Chavez also testified in his own defense, stating that he had belonged to a counter-revolutionary group in Cuba.[22] He gave details of his imprisonment (for attempting to escape and for stealing military property) in Cuba, and his eventual escape from the island. According to his trial testimony,[23] Chavez encountered Ed Scheinhaus at the horse farm trailer after Jimmy had already been killed, and helped Ed to dispose of the boy's body.[24]
*746 Chavez testified that, after he was brought to police headquarters in connection with Jimmy's disappearance, he was mistreated. He stated that, when he was placed in the police car, he was told, "Don't do anything stupid or we'll shoot you. We're going to kill you."[25] He complained that his watch and beeper were taken away from him, and returned only after he gave his final confession.[26] Chavez stated that, when they were interrogating him, he did not know what date or time it was.[27] He said that he was not permitted to sleep, and no one ever offered him a pillow or a blanket. Chavez also claimed that the officers brought the book bag into the interrogation room, and asked Chavez to handle it and look through its contents, which he did. According to Chavez, the police goaded him into making up lies.[28] He stated that the officers suggested details of his confession, and, to avoid deportation, he did whatever they wanted.[29]
After the defense rested, the State presented rebuttal testimony. The officers refuted that they had ever threatened Chavez, coerced him, or suggested any part of the confession to him; they denied that they had taken Chavez's watch away or that anyone had hit him; and they testified that he had never mentioned Ed as the perpetrator during the questioning process.[30] Ed Scheinhaus's parole officer *747 testified that Ed (who is in the pest control business) had his permission to travel to take care of a client on the afternoon on which he had received a speeding ticket, and that Ed had shown the ticket to the parole officer himself, without being asked to do so. He testified that Ed had lost his ankle bracelet once (prior to September 11), and that he had come in that same day to have it replaced with a new one. He said that the file would only reflect times when calls were made to the house and Ed did not respond. He said that he had nothing in the file for the month of September 1995, which indicated that Ed had remained home as required, and that no violations had occurred.
At the close of rebuttal, Chavez renewed all motions, including the motion to suppress his statements, the motion for judgment of acquittal (particularly reiterating that the State had failed to prove the corpus delicti of the charge of sexual battery), and the motion for mistrial, based upon alleged cumulative errors. These motions were denied. The jury was instructed, and, following deliberation, entered verdicts of "guilty" on all of the counts charged.
Following the penalty phase of the trial, the jury recommended death by a vote of twelve to zero. The trial court followed the jury's recommendation, sentencing Chavez to death for the homicide and to consecutive terms of life imprisonment with three-year mandatory minimum sentences for the convictions of kidnapping and sexual battery.
On November 10, 1998, a hearing was conducted pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993). Consistent with Chavez's request, a prepared presentence investigation report was not considered. Sentencing memoranda were filed, and both the State and Chavez relied upon the evidence already presented. A death sentence was imposed on November 23, 1998, and this timely appeal followed.

APPEAL
Chavez raises multiple claims of error on appeal. We address each claim in turn. In so doing, we initially observe that, despite the egregious and inflammatory facts involved in a tragedy such as this case, we must conduct that dispassionate review which our system of law requires to arrive at a just and legally correct result so that there is no miscarriage of justice.

Probable Cause For Chavez's Arrest
First, Chavez asserts that the police did not have probable cause to arrest him in connection with Jimmy Ryce's disappearance. On this record, we conclude that such probable cause did exist. As we stated in Walker v. State, 707 So.2d 300, 312 (Fla.1997):
Probable cause for arrest exists where an officer "has reasonable grounds to believe that the suspect has committed a felony. The standard of conclusiveness and probability is less than that required to support a conviction." Blanco v. State, 452 So.2d 520, 523 (Fla.1984). The question of probable cause is viewed from the perspective of a police officer with specialized training and takes into account the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Schmitt v. State, 563 So.2d 1095, 1098 (Fla. 4th DCA 1990).

See also McCarter v. State, 463 So.2d 546, 548-49 (Fla. 5th DCA 1985) ("Probable cause to arrest exists when facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe *748 that an offense has [been] or is being committed.").
Here, the officer's tip came from a reliable, identified citizen informant who was unconnected to the crime which was being investigated. That informant, being Chavez's employer and the owner of the property where Chavez lived, had reason to know that Chavez was not a friend of the Ryce child. Ed Scheinhaus, the informant's son, who was also present when the book bag was found in Chavez's trailer, had indicated his shock to his mother when he realized that the book bag contained items which belonged to Jimmy Ryce. He knew that Chavez had seen the televised requests for assistance related to Jimmy's disappearance, and had expressed an interest in them.
The little boy had disappeared months earlier, when he had been expected to return home directly from school, suggesting that he was taken by force. A handgun stolen from Mrs. Scheinhaus was found in the trailer by the informant at the same time the book bag was discovered. Further, the Scheinhaus property where Chavez lived was in the same general vicinity from which the little boy had disappeared. That neighborhood had been saturated with flyers depicting Jimmy, and asking for help. Under these circumstances, it is illogical to suggest that a reasonable person (aware of the massive effort to locate Jimmy) who merely happened to find the book bag would take it to his living quarters without ever reporting the matter to authorities.
This cumulative information, known at the time Chavez was apprehended, constituted probable cause to arrest Chavez in connection with the Ryce kidnapping. Cf. Justus v. State, 438 So.2d 358, 363 (Fla. 1983) (upholding an arrest without a valid warrant based upon "cumulative information" which provided probable cause in a murder/kidnapping case). The fact that the police maintained that Chavez submitted to them voluntarily, or that the State also argued that there was probable cause to arrest Chavez for stealing property of Mrs. Scheinhaus, does not invalidate Chavez's arrest based upon probable cause in connection with Jimmy Ryce's kidnapping. Cf. State v. Carmody, 553 So.2d 1366, 1367 (Fla. 5th DCA 1989) (observing that the validity of Carmody's arrest was not affected where, despite two valid reasons providing probable cause for the arrest, he was arrested on an unsupportable one); McCarter v. State, 463 So.2d at 549 n. 1 (Fla. 5th DCA 1985) (observing that the "fact that McCarter was arrested for attempted first degree murder rather than attempted kidnapping does not invalidate the search incident to the arrest since the label placed upon an arrest by the arresting officer is not determinative of the question of whether the arrest was legal").

Chavez's Confession
Chavez argues that the trial court erred in denying his motion to suppress the confession, for a variety of reasons. The trial court's denial of Chavez's motion to suppress is presumed to be correct and must be upheld where, as here, that decision is supported by the record. See Rhodes v. State, 638 So.2d 920, 925 (Fla. 1994); Owen v. State, 560 So.2d 207, 211 (Fla.1990).

Length of Interrogation
Chavez claims that his confession must be suppressed as involuntary, because he was subjected to a period of continuous police custody for more than fifty-four hours. The length of interrogation is a significant factor to consider in determining whether Chavez's statements were coerced. In reviewing the denial of his motion to suppress, this Court defers to the trial court on questions of historical fact, but conducts a de novo review of the *749 constitutional issue. See Connor v. State, 803 So.2d 598 (Fla.2001). To establish that a statement is involuntary, there must be a finding of coercive police conduct. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (recognizing that the defendant's own perception of coercion is not the determinative factor).
Under the unique circumstances of this case,[31] the police interrogation conducted here was not so coercive as to render Chavez's confession involuntary. His version of the facts regarding the circumstances of his questioningwhich was refuted by testimony both from an independent witness (the translator) and from the officers involvedwas apparently disbelieved by the trier of fact.
Although Chavez was questioned over the course of several days, he was provided with food, drink, and cigarettes (as requested) at appropriate times, and permitted to have frequent breaks. His interrogation was also interspersed with time away from the police facilities for visits to various properties, a six-hour rest period (where Chavez was offered a blanket and a pillow), and times when he was left alone for quiet reflection. He was repeatedly given Miranda warnings, in Spanish, and indicated each time that he fully understood them. Consequently, the trial court did not err in denying Chavez's motion to suppress on this ground. Compare Walker v. State, 707 So.2d 300, 311 (Fla.1997) (upholding voluntariness of confession where the defendant was questioned for six hours during the morning and early part of day, was provided with drinks and allowed to use the bathroom when he wished, and was never threatened with capital punishment, or promised anything other than that the officer would inform the prosecutor that the defendant had cooperated), with Brewer v. State, 386 So.2d 232 (Fla.1980) (finding confession to be involuntary where police threatened the defendant with the electric chair, implying that they had power to reduce the charge against him and that his confession would lead to lesser charge), and State v. Sawyer, 561 So.2d 278, 290-91 (Fla. 2d DCA 1990) (finding confession to be involuntary where it was the product of enforced sleeplessness resulting from a sixteen-hour serial interrogation during which the defendant was provided with no meaningful breaks and police asked him misleading questions, denied his requests to rest, refused to honor his Miranda rights and used the defendant's history of blackouts to undermine his reliance on his own memory).

Subject of Decent Burial
Next, Chavez asserts that his confession should be suppressed as involuntary because, on two occasions, officers suggested that Jimmy's remains needed to be discovered for a decent burial, each of which precipitated incriminating statements. The record reflects that Estopinan did, on two occasions, say to Chavez that Jimmy deserved a decent burial. While one such event prompted an emotional response from Chavez (when he said that Jimmy no longer existed), this occurred only after Chavez had already admitted to having disposed of Jimmy's body. Neither of the occasions precipitated a truthful account of where the body was located. In context, these questionable requests for information did not coerce Chavez's confession, nor did they render it "involuntary." *750 See Lukehart v. State, 776 So.2d 906 (Fla.2000) (finding no error in failure to suppress statements Lukehart made after use of Christian burial suggestion, where this did not directly result in statements being given).

Sufficiency of Miranda Warnings
Chavez also asserts that his confession must be suppressed as involuntary because he was not properly advised of his right to consult with counsel before questioning. See Traylor v. State, 596 So.2d 957, 957 n. 13 (Fla.1992) (observing that "the suspect has the right to consult with a lawyer before being interrogated and to have the lawyer present during the interrogation"). Here, Chavez, who indicated that he had a twelfth-grade education, read the Metro Dade Miranda form in Spanish, and initialed it. This form has specifically been upheld as sufficient. See Cooper v. State, 739 So.2d 82, 84 n. 8 (Fla.1999) (approving this warning on the Metro Dade rights form: "If you want a lawyer to be present during questioning, at this time or any time thereafter, you are entitled to have a lawyer present."). Thus, Chavez's claim that he was insufficiently informed of his Miranda rights fails.

Request for Death Penalty
Chavez asserts that his confession must be suppressed as involuntary because he expressed his desire to remain silent if not promised the death penalty. However, the record reflects that when Chavez indicated that he would disclose the location of Jimmy's body only if he were assured a death sentence, he was told unequivocally that he could not be guaranteed that the death penalty would be imposed. Despite having been so advised, Chavez, after a period of silent reflection, elected to confess. As stated in Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), "Miranda gives the defendant a right to choose between speech and silence, and [the defendant] chose to speak." As in Keen v. State, 504 So.2d 396 (Fla.1987), the record here does not support a Fifth Amendment violation. Cf. Keen, 504 So.2d at 400 (refusing to suppress a statement where the defendant "never expressed to the detectives a desire to speak with counsel on any of the four occasions when he was advised of his rights, he initiated conversations with the detectives throughout this entire time, and signed a waiver of rights form") (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Hoffman v. State, 474 So.2d 1178 (Fla.1985); and Cannady v. State, 427 So.2d 723 (Fla. 1983)).

Chavez's Alienage
Chavez next claims that his confession should have been suppressed as involuntary because his alienage, lack of prior experience with the United States criminal justice system, and limited understanding of English produced an involuntary confession. Cf. United States v. Fung, 780 F.Supp. 115, 116 (E.D.N.Y. 1992) (reflecting that Fung's poor language skills and ignorance of the American legal system were sufficient to show that she lacked understanding of Miranda rights even though she read them aloud in her native language). In this case, Chavez began the interview process speaking in English; however, Detective Murias translated all questions into Spanish from the beginning, until Estopinan entirely assumed the questioning which was conducted in Spanish (after administration of polygraph tests). Chavez's lengthy handwritten statement in Spanish (his first version of what happened to Jimmy, in which he recounted having crushed the boy accidentally against the horse farm gate), which is contained in the record, is grammatically correct, reflecting a literate person, and even contains the caveat that *751 Chavez wished "it to be considered that the dates he has included in the statement are not considered to be exact." In fact, when Chavez's formal statement was transcribed, he was careful to correct both spelling and grammatical errors. He was repeatedly advised in Spanish of his Miranda rights, and stated that he knew his polygraph test result was not admissible evidence.
The record clearly reflects that Chavez's intelligence, education, and alienage did not adversely affect his understanding of his rights during the police interrogation progress. Finding no support in the record, the argument that Chavez's background caused him to misapprehend his rights in the American system fails.

Probable Cause/First Appearance
Chavez argues that the delay in bringing him before a judicial officer violated Florida Rules of Criminal Procedure 3.130 and 3.133, and therefore required suppression of his confession. A trial court's ruling on a motion to suppress is presumed correct. See Medina v. State, 466 So.2d 1046 (Fla.1985). However, under Gerstein v. Pugh, 420 U.S. 103, 125, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), Chavez had a constitutional right to have a judicial determination that probable cause existed for his continued detention within the first forty-eight hours after his arrest, and the delay in obtaining that determination is presumptively unreasonable. Cf. Powell v. Nevada, 511 U.S. 79, 83-84, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) (observing that, although the four-day delay involved was presumptively unreasonable under McLaughlin, it did not "necessarily follow, however, that Powell must `be set free' ... or gain other relief, for several questions remain open for decision on remand, [including] the appropriate remedy for a delay in determining probable cause (an issue not resolved by McLaughlin), ... or the district attorney's argument that introduction at trial of what Powell said on November 7, 1989, was harmless in view of a similar, albeit shorter, statement Powell made on November 3, prior to his arrest."). In determining whether the trial court erred in denying Chavez's motion to suppress his confession for this reason, we begin by examining the purpose furthered by the criminal defendant's right to a prompt probable cause determination and first appearance.
The principles underlying the necessity for a probable cause determination can be found in Gerstein. There, the Supreme Court observed that the Fourth Amendment required such a determination as a prerequisite to a detainee's further restraint of liberty:
A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication.
McNabb v. United States, 318 U.S. 332, 343, 63 S.Ct. 608, 87 L.Ed. 819 (1943), quoted in Gerstein, 420 U.S. at 118, 95 S.Ct. 854. The limited purpose of the *752 hearing shaped its parameters, as established by the Supreme Court:
The sole issue is whether there is probable cause for detaining the arrested person pending further proceedings. This issue can be determined reliably without an adversary hearing. The standard is the same as that for arrest. That standard-probable cause to believe the suspect has committed a crime-traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof.
...
The use of an informal procedure is justified not only by the lesser consequences of a probable cause determination but also by the nature of the determination itself. It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt. See F. Miller, Prosecution: The Decision to Charge a Suspect with a Crime 64109 (1969). This is not to say that confrontation and cross-examination might not enhance the reliability of probable cause determinations in some cases. In most cases, however, their value would be too slight to justify holding, as a matter of constitutional principle, that these formalities and safeguards designed for trial must also be employed in making the Fourth Amendment determination of probable cause.
Because of its limited function and its nonadversary character, the probable cause determination is not a "critical stage" in the prosecution that would require appointed counsel. The Court has identified as "critical stages" those pretrial procedures that would impair defense on the merits if the accused is required to proceed without counsel. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
Gerstein, 420 U.S. at 120-22, 95 S.Ct. 854 (footnotes omitted).
While the probable cause hearing may be combined with the first appearance, the purpose of a first appearance is different. It serves as a venue for informing the defendant of certain rights, and provides for a determination of the conditions for the defendant's release. At first appearance, a judicial officer informs the defendant of the charge (providing the defendant with a copy of the complaint), and further informs the defendant that:
(1) the defendant is not required to say anything, and that anything the defendant says may be used against him or her;
(2) if unrepresented, that the defendant has a right to counsel, and, if financially unable to afford counsel, that counsel will be appointed; and
(3) the defendant has a right to communicate with counsel, family, or friends, and if necessary, will be provided reasonable means to do so.
Fla. R.Crim. P. 3.130; see generally 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 1.3(k) (2d ed.1992). Thus, the first appearance certainly provides one point at which the right to counsel may become affixed. See generally Fla. R.Crim. P. 3.111(a).
Chavez contends that his last confession was improperly coerced through a deprivation of his right to a first court appearance within twenty-four hours of arrest. We have held that coercion of this type, if properly shown, would be a possible ground for suppression of a confession. See Keen v. State, 504 So.2d 396, 399-400 *753 (Fla.1987), disapproved in part on other grounds, Owen v. State, 596 So.2d 985, 990 (Fla.1992). However, where, as here, a defendant has been sufficiently advised of his rights, a confession that would otherwise be admissible is not subject to suppression merely because the defendant was deprived of a prompt first appearance. "[W]hen a defendant has been advised of his rights and makes an otherwise voluntary statement, the delay in following the strictures of [rule 3.130] must be shown to have induced the confession." Keen, 504 So.2d at 400; see also Johnson v. State, 660 So.2d 648, 660 (Fla.1995) (observing that a confession may be suppressed where it was coerced through deprivation of a first court appearance within twenty-four hours); Williams v. State, 466 So.2d 1246, 1248 (Fla. 1st DCA) (reflecting that no per se rule required suppression of confessionwhich was suppressed on other groundsbecause of delay of first appearance until thirty hours after arrest), review denied, 475 So.2d 696 (Fla.1985).
On this point, the Court's analysis in Keen is particularly instructive:
Keen urges three reasons why his statement should have been suppressed. First, he claims that pursuant to Rule of Criminal Procedure 3.130, which requires an arrested person to be taken before a judicial officer within twenty-four hours of arrest, any statement made in violation of the rule must be suppressed. Keen points out that the statement at issue here was made more than twenty-four hours after his arrest. While a violation of the rule has been shown, we reject Keen's suggestion that an otherwise voluntary statement given after twenty-four hours is per se inadmissible. We agree with the reasoning expressed by the First District Court of Appeal in Headrick v. State, 366 So.2d 1190 (Fla. 1st DCA 1978), that each case must be examined upon its own facts to determine whether a violation of the rule has induced an otherwise voluntary confession. Id. at 1191. The court reasoned that when a defendant has been advised of his rights and makes an otherwise voluntary statement, the delay in following the strictures of the rule must be shown to have induced the confession. Id. See also Williams v. State, 466 So.2d 1246 (Fla. 1st DCA), review denied, 475 So.2d 696 (Fla.1985). Sub judice, Keen was advised on his rights to remain silent and his right to counsel on four separate occasions and gave the statement at issue only after voluntarily signing a waiver of rights. Absent a showing that the delay induced this otherwise voluntary statement, we find that the trial court properly denied Keen's motion to suppress.
Keen's suggestion that our decision in Anderson v. State, 420 So.2d 574 (Fla. 1982), mandates that his statement be suppressed is unpersuasive. Anderson is clearly distinguishable as there the evidence presented to this Court showed that Anderson had been indicted prior to being taken into custody by Florida law enforcement officials who drove Anderson by car for four days from Minnesota back to Florida. The deputies were aware that Anderson had no counsel in Minnesota and that he desired appointed counsel once returned to Florida. Holding that Anderson's statement should have been suppressed, we found "significant" the fact that the statement at issue came "far after" Anderson should have been brought before a judicial officer "with the attendant advice of rights and appointment of counsel." Id. at 576. We also found that the record failed to show a valid waiver. Id. The facts sub judice stand in stark contrast. Keen was not indicted until after the statement was given to the detectives, he was advised on four separate occasions of his right to remain *754 silent and his right to counsel, and he signed a waiver before giving the statement. It unequivocally appears from the record that Keen knowingly, intelligently and voluntarily waived his rights before making the statement.
504 So.2d at 399-400.
Applying the same analysis to this record, we conclude that the failure to provide Chavez with a first appearance within twenty-four hours after his arrest did not compel his confession. Here, as in Keen, the record reflects that Chavez was repeatedly advised of his Miranda rights, and knowingly, intelligently, and voluntarily waived them prior to confessing. Therefore, the trial court properly denied his motion to suppress on that basis. However, the question of whether suppression of Chavez's last confession is appropriate as a remedy for the failure to provide a prompt probable cause determination remains.
Because Chavez was not afforded a probable cause determination within forty-eight hours of having been taken into police custody, the burden shifts to the State to show that the existence of a bona fide emergency or other extraordinary circumstance justified the delay; otherwise, a McLaughlin violation has occurred. See McLaughlin, 500 U.S. at 57, 111 S.Ct. 1661. Here, record testimony suggests that the police perceived that exigent circumstances existed because of their efforts to locate the missing child, who had disappeared under untoward circumstances.[32] However, given the amount of time which had transpired between Jimmy's initial disappearance and Chavez's apprehension, those circumstances were not as compelling as they might otherwise have been had the two events occurred more closely in time. It is therefore unclear whether extraordinary circumstances would excuse the officers' failure to obtain a probable cause determination within forty-eight hours of Chavez's arrest.
Nonetheless, assuming that the failure to bring Chavez before a magistrate to determine probable cause violated the rule articulated in McLaughlin, we conclude that suppression of his last confession is not an appropriate remedy for the violation.[33] On this record, the unique circumstances leading to Chavez's last confession weigh in favor of admission rather than suppression. Further, even assuming that suppression were appropriate, given the overwhelming evidence of Chavez's guilt, the error in admitting his last confession would be harmless.
As stated earlier, probable cause to arrest Chavez in connection with the disappearance of Jimmy Ryce existed at the time of his apprehension. Chavez has not *755 demonstrated that either his arrest on December 6 or his detention during the first forty-eight hours following the arrest was unlawful. During that period of time, Chavez admitted his involvement with Jimmy's disappearance; admitted shooting the boy; admitted disposing of Jimmy's remains; and stated that what he had done would never have happened had he not been sexually battered as a boy in Cuba.
During this time, crime scene investigators also had noticed the cement-filled planters on the Scheinhaus property, and suspected that they might contain a cadaver.[34] A "tube of JR water-based lubricant" and a blood-stained part of the wood floor of the horse farm trailer just inside the front door had been collected by crime scene technicians and packaged for transmittal to serology for processing. The murder weapon, containing Chavez's fingerprint, had already been recovered. While the particulars of how and why Jimmy died and what was done to his body afterwards evolved over this period of time, Chavez's involvement as the perpetrator of the crimes, and the motivation he ultimately revealed for committing them, did not change significantly from what investigators came to know during the first forty-eight hours, as compared to what Chavez disclosed in his last confession which occurred very shortly thereafter.
A number of courts which have examined the rationale of Gerstein and McLaughlin have concluded that the failure to provide a defendant with a timely probable cause determination does not require suppression of evidence obtained during an interrogation if sufficient evidence existed at the time the individual was first taken into police custody to arrest the defendant for the crime with which he or she was subsequently charged. In United States v. Daniels, 64 F.3d 311 (7th Cir.1995), cert. denied, 516 U.S. 1063, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996), the defendant was arrested for bank robbery, and arraigned within the forty-eight hour time limit of McLaughlin (some forty hours after his arrest), but he argued that the police delayed his arraignment so that they could gather more evidence against himspecifically, so they could conduct another lineup while Daniels was still in their custody. The Daniels court disagreed, reasoning that McLaughlin prohibited delays designed to gather "additional evidence to justify the arrest." It observed that the lineup was conducted to bolster the case against Daniels:
Daniels' argument seems to interpret [McLaughlin] to preclude law enforcement from bolstering its case against a defendant while he awaits his Gerstein hearing; that is a ludicrous position. Gerstein and its progeny simply prohibit law enforcement from detaining a defendant to gather evidence to justify his arrest, which is a wholly different matter. Probable cause to arrest Daniels already existed and that is what Ewer's affidavit reported.
Id. at 314; see also Peterson v. State, 653 N.E.2d 1022, 1025 (Ind.Ct.App.1995) (holding that interrogation of an arrested suspect does not constitute an unreasonable delay where police had probable cause for arrest); State v. Chapman, 343 N.C. 495, 471 S.E.2d 354, 356 (1996) (holding that the interrogation of a defendant about crimes for which he has just been arrested is not an "unnecessary delay" for purposes *756 of a McLaughlin analysis). As stated in Riney v. State, 935 P.2d 828, 834-35 (Alaska Ct.App.1997):
If McLaughlin were interpreted in the manner Riney suggests [that interrogation of an arrested suspect would constitute an unreasonable delay even where the police already have probable cause for the suspect's arrest], it would lead to an unjustifiable disparity in treatment between persons arrested on warrants and persons arrested without warrants. Under even the most expansive interpretation of McLaughlin, persons arrested on warrants can be interrogated following their arrest: no Gerstein hearing is required when a person is arrested on a warrant, because the judicial determination of probable cause for the arrest has already been made. See State v. Vice, 519 N.W.2d at 566. Thus, under Riney's reading of McLaughlin, the existence or non-existence of an arrest warrant would determine whether the police were authorized to question someone they had just taken into custody. Riney suggests no rationale for such a rule, and we perceive no convincing rationale for it either. So long as the police do not detain a suspect for the purpose of gathering probable cause to justify the arrest after the fact, questioning an arrestee about the crime(s) for which he or she has been arrested does not constitute an "unreasonable" delay under Gerstein and McLaughlin.

Here, there was probable cause to arrest Chavez in connection with Jimmy's disappearance at the time he was detained, and the defendant, who was given his Miranda rights four times prior to confessing, also signed an affidavit waiving his first appearance within forty-eight hours of apprehension.[35] The record reflects ample evidence of Chavez's informed waiver of his right to counsel, his knowing waiver of the right to first appearance, and his willing cooperation with the police officers in their investigation of Jimmy's disappearance.[36]
Further, even assuming a Fourth Amendment violation occurred due to the failure to comply with the McLaughlin rule, the record here reflects that Chavez's confession "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).[37] As we stated (in a *757 different context) in Voorhees v. State, 699 So.2d 602, 611 (Fla.1997):
Several years after Wong Sun [v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)], the Supreme Court clarified the analysis to be undertaken when determining whether evidence obtained following an illegal detention must be suppressed. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). These factors include whether Miranda warnings were given, the temporal proximity of the arrest and confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of officer misconduct. Id. at 603-04, 95 S.Ct. at 2261-62. The voluntariness of the statement is a threshold requirement, and the burden of showing admissibility is on the state. Id.; see also Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Sanchez-Velasco v. State, 570 So.2d 908 (Fla.1990), cert. denied, 500 U.S. 929, 111 S.Ct. 2045, 114 L.Ed.2d 129 (1991).
Applying the Brown factors, we conclude that the trial court did not err in denying suppression of Chavez's confession.
Here, Chavez was given Miranda warnings three times during the first forty-eight hours of his detention, and was informed of those rights a fourth time immediately prior to his final confession. Chavez gave several incriminating statements during this time, with only the very last version of his confession being given after forty-eight hours had elapsed. Importantly, during the period that Chavez was in police custody, there were numerous breaks, including two separate outings to properties in the Redlands. Although Chavez was in the company of police officers, the testimony of those who observed Chavez, and the photographs depicting him, reflect that Chavez was not constrained in any way during that time. Only hours before giving his final confession, after a period of reflection, Chavez himself initiated the conversation with Detective Estopinan in which he recounted his sexual abuse in Cuba, stating that, but for those experiences, what he had done here would not have occurred. These numerous periods of rest, outings to the southern part of the county, refreshments, and quiet reflection weigh significantly in our analysis.
Lastly, we consider the purpose and flagrancy of the official misconduct. Here, as indicated earlier, there was probable cause to arrest Chavez at the time he was first detained, and it is clear that Chavez's continued detention was focused on locating his child victim, rather than on "gathering additional evidence to justify the arrest." McLaughlin, 500 U.S. at 56, 111 S.Ct. 1661. While we admonish against, and in no way condone, the delay which occurred here in obtaining a prompt and impartial probable cause determination, the totality of the circumstances reflected in this record does not evidence purposeful misconduct on the part of the officers motivating that delay.
Accordingly, after considering the above factors, we conclude that Chavez's final confession, even if made while Chavez was held in violation of the Fourth Amendment, was not the product of the unlawful detention. Cf. Powell, 511 U.S. at 89, 114 S.Ct. 1280 (Thomas, J., joined by Rehnquist, C.J., dissenting) (reflecting that, had the issue of the propriety of suppressing the defendant's statement been reached, applying established precedents, the statement should not be suppressed "because the statement was not a product of the McLaughlin violation"); Darks v. State, 954 P.2d 152 (Okla.Crim.App.1998) (affirming Darks' conviction, even though he was not given a probable cause determination within forty-eight hours, because he was *758 not "coerced into giving evidence he otherwise would not give," and his "confession was not a product of an illegal detention"). Therefore, under the unique circumstances of this case, the record supports the trial court's denial of Chavez's motion to suppress.

Right to Counsel
Chavez also argues that the delay in providing him a first appearance within twenty-four hours of arrest interfered with his right to counsel, which would have attached at first appearance, resulting in a deprivation of this right. Cf. Peoples v. State, 612 So.2d 555, 557 & n. 2 (Fla.1992) (observing that the knowing exploitation of an opportunity to confront the accused without counsel is as much a breach of the obligation "not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity"). Under the Florida Constitution, the right to counsel attaches "at the earliest of the following points: when he or she is formally charged with a crime via the filing of an indictment or information, or as soon as feasible after custodial restraint, or at first appearance." Traylor v. State, 596 So.2d 957, 970 (Fla.1992) (footnotes omitted). Chavez also argues that his right to counsel was infringed upon when police investigators wrongfully excluded an Assistant Public Defender who had not yet been appointed as Chavez's counsel from participation in the interrogation process.
As fully discussed before, here, Chavez was properly, timely and repeatedly informed of his right to counsel. He knowingly and voluntarily waived that right, and the record does not support a conclusion that the delay in his first appearance induced that waiver. Further, as this Court has previously held, it was not error for the police to exclude an Assistant Public Defender who had not yet been appointed as Chavez's counsel. See Harvey v. State, 529 So.2d 1083, 1085 (Fla.1988) (finding no due process violation where the police denied a public defender access to the defendant when the public defender voluntarily went to the jail after hearing about the defendant's arrest to see if the defendant needed a lawyer); cf. also Smith v. State, 699 So.2d 629 (Fla.1997) (observing, in a case where the defendant tried to suppress his confession obtained after an assistant public defender had volunteered and been appointed to represent the defendant that "[t]he mere appointment of an attorney at the attorney's request is not enough to invoke the right [to counsel]; the accused must invoke the right."). Therefore, the trial court did not err in failing to suppress Chavez's confession based upon a claimed violation of the right to counsel for this reason.

Media Coverage
As his next claim, Chavez asserts that the trial court deprived him of the right to a fair trial when, upon change of venue from Dade County to Orange County, it reversed its earlier ruling prohibiting photography of jurors in the courtroom. Florida Rule of Judicial Administration 2.170 (Standards of Conduct and Technology Governing Electronic Media and Still Photography Coverage of Judicial Proceedings) expressly authorizes the use of video and still cameras in the courtroom, and provides, in subdivision (i), that "[r]eview of an order excluding the electronic media from access to any proceeding, excluding coverage of a particular participant, or upon any other matters arising under these standards shall be pursuant to Florida Rule of Appellate Procedure 9.100(d)." (Emphasis supplied.) As occurred on two occasions here, when determining whether media access will be restricted, the court must provide notice and an opportunity for the media to be heard. See WFTV, Inc. v. State, 704 So.2d 188, 190 (Fla. 4th DCA 1997). This hearing enables the court to determine *759 whether there is an evidentiary basis to conclude that the effect of cameras on the proceeding would be qualitatively different on the participants from the effect persons ordinarily experience in the presence of cameras, or whether that effect would be qualitatively different from the result of coverage by other types of media. See State v. Palm Beach Newspapers, 395 So.2d 544 (Fla.1981); State v. Green, 395 So.2d 532 (Fla.1981); In re Petition of Post-Newsweek Stations, Florida, Inc., 370 So.2d 764 (Fla.1979); Florida Times-Union v. State, 747 So.2d 1030, 1032 (Fla. 1st DCA 1999).
In Post-Newsweek Stations, this Court considered a petition to change Canon 3A(7) of the Code of Judicial Conduct to allow the electronic media access to Florida's courtrooms. See In re Petition of Post-Newsweek Stations, 370 So.2d at 765. One of the arguments considered by the Court involved the psychological impact on courtroom participants; in particular, the expressed concern that "jurors [would] either be distracted from concentrating on the evidence and the issues to be decided by them or, because of their identification with the proceedings, they [would] fear for their personal safety, be subjected to influence by members of the public, or attempt to conform their verdict to community opinion." Id. at 775. The Supreme Court addressed these "concerns that any fair minded person would share because they would, certainly in combination, be antithetical to a fair trial," stating:
The fact remains, however, that the assertions are but assumptions unsupported by any evidence. No respondent has been able to point to any instance during the pilot program period where these fears were substantiated. Such evidence as exists would appear to refute the assumptions.
Id. at 775-76. The trial court's exercise of discretion in deciding whether to prohibit media coverage of a particular trial participant is based upon the following standard:
The presiding judge may exclude electronic media coverage of a particular participant only upon a finding that such coverage will have a substantial effect upon the particular individual which would be qualitatively different from the effect on members of the public in general and such effect will be qualitatively different from coverage by other types of media.
Id. at 779. In the context of jury selection, however, it would not "be necessary to show particularized concern on the part of each prospective juror in order to preclude cameras from photographing the entire venire." Times Publishing Co. v. State, 632 So.2d 1072, 1075 (Fla. 4th DCA 1994); accord Sunbeam Television Corp. v. State, 723 So.2d 275, 280 (Fla. 3d DCA 1998) (Cope, J., dissenting) (observing, in the dissenting opinion later adopted by the court on rehearing en banc, that "[w]here, as here, the concern about unsolicited contact with jurors is applicable to the entire group of potential, and actual, jurors, the jurors can be treated as a group, without a juror-by-juror inquiry").
In making its ruling here, the court relied upon the original panel decision in Sunbeam Television Corp. v. Florida, 723 So.2d 275 (Fla. 3d DCA), reh'g en banc granted, id. at 280 (Fla. 3d DCA 1998), review denied, 740 So.2d 529 (Fla.1999). In that highly controversial case, two television stations challenged an order prohibiting them from publishing jurors' names and addresses and videotaping them. On appeal, the broadcasters conceded that the court could forbid publication of names and addresses, but argued that they could not be prevented from photographing the jurors. The court initially upheld the prohibition against publication of names and addresses, but quashed the prohibition on *760 video photography, holding that the court's concern that jurors could be identified from a broadcast and subjected to unsolicited contact from members of the public did not justify the order. On rehearing en banc, in a decision published just prior to Chavez's Spencer hearing, the district court adopted the dissenting view which had been in the earlier decision before a panel of the court, concluding that the court's expressed interest in insulating jurors from undue influence supported its prohibition against videotaping jurors' faces. Such order could not, however, act as an unconstitutional prior restraint by precluding the broadcasting of any juror information revealed in open court.
Had the trial judge been prescient, he would not have abused his discretion in continuing the order prohibiting the jurors' faces from being photographed. However, Chavez has not shown that the judge abused his discretion in failing to do so. No court has held that it is per se reversible error to allow the jurors' faces to be photographed in a controversial criminal trial. It is ultimately the fairness of the proceedings which determines the appropriateness of limitations on media access.
Here, the prospective jurors were advised by the trial court that cameras would be allowed in the proceedings, and were asked, as a group, whether any of them had concerns about that. The two prospective jurors who did express reservations regarding media coverage were removed for cause, and did not serve on Chavez's jury. The record does not reflect that Chavez sought review of the trial court's ruling which permitted such coverage, as he was entitled to do, even though defense counsel consistently maintained that the trial court had the authority to continue to limit media access as it had originally ordered.
Further, the trial court advised defense counsel that it was well aware of his position with respect to photographing the jurors, and said that the court would "readdress this issue if it's warranted in the future. So if the issues change and you need to bring something to the Court's attention, please notify the Court." To minimize disruption in the courtroom, the trial court assigned the jurors identification numbers to be used instead of their names, and required that the "still photographer, if there is one going to be in court during the proceedings, will have to remain seated in one seat throughout the course of the proceedings while the jurors are in the courtroom," in accordance with the Rules of Judicial Administration. Considering all these circumstances, the order allowing jurors to be photographed and the denial of Chavez's request to conduct individual voir dire of jurors not expressing concerns about the presence of cameras did not impair the fundamental fairness of Chavez's trial.

Admission of Mattress
Chavez maintains that the trial court reversibly erred in admitting, over timely objection, a mattress (found in the trailer at the horse farm) which was stained with blood stipulated to belong to neither Chavez nor Jimmy Ryce. Chavez asserts that, even if the mattress had any probative value, it was clearly outweighed by the prejudicial impact. See § 90.403, Fla. Stat. (1995) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or needless presentation of cumulative evidence.").
As we observed in Goodwin v. State, 751 So.2d 537, 540 (Fla.1999) (citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)), the harmless error analysis adopted in Chapman *761 "requires appellate courts to first consider the nature of the error complained of and then the effect this error had on the triers of fact." The "oft-quoted standard" of appellate review (in the context of alleged improper prosecutorial conduct) requires reversal where it is "completely impossible ... to say that the State has demonstrated, beyond a reasonable doubt" that the error complained of "did not contribute to" the defendant's conviction. Id. (quoting Chapman, 386 U.S. at 26, 87 S.Ct. 824). Under section 90.403, Florida Statutes (1995), relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or potential to mislead the jury. These competing values must be weighed in determining admissibility. See State v. McClain, 525 So.2d 420, 422-23 (Fla.1988).
Here, Chavez objected to admission of the mattress, which was stipulated to be unrelated to this case. The State argued, principally, that it was being offered to show, contrary to the defense theory of the case, that the interrogating officers did not "force-feed" Chavez the elements of his confession during questioning. The State reasoned that, because the police knew about the bloody mattress at the time of Chavez's interrogation, had they been supplying Chavez with the details of his confession, the mattress would logically have been included as an element of the factual narrative. The trial court, agreeing that the mattress was relevant, permitted its introduction into evidence, providing the cautionary instruction that the mattress was not related to this case, and that neither Chavez nor Jimmy Ryce was the source of the blood stain.
The discovery by authorities of the obviously bloody mattress in the trailer during the time that Chavez was being questioned, and its subsequent testing, were logically relevant to disprove Chavez's contention that the officers who interrogated him had suggested all the elements of his detailed confession. The blood on the mattress was apparent, and, although it had not been forensically checked while Chavez was being questioned, had the officers been prompting Chavez, as he claims, it would have been logical to have asked about the mattress. Further, the fact that the mattress was tested is relevant to Chavez's claim that the police failed to investigate his lead when he told them that Ed was the real killer. For this limited purpose, however, it would have been sufficient to admit into evidence testimony regarding the mattress and photographs of the mattress as it appeared at the crime scene, rather than the mattress itself.
Here, defense counsel argued that the bloody mattress raised the spectre that Chavez had murdered an additional person other than the victim in this case. However, that conclusion does not logically flow from the facts as adduced at trial. By his own confession, Chavez does not appear to have been familiar with the interior of the trailer where Jimmy was murdered. Chavez said that he had to look around for something to use as a lubricant, and test it to see if it burned.[38] Further, his victim was shot while trying to escape; he was not stabbed to death, nor does the record reflect the extensive presence of blood. There is absolutely no suggestion in the record that Chavez killed anyone other than Jimmy.
*762 However, even assuming that the court erred in allowing the mattress itself to be admitted (because the prejudicial effect potentially outweighed the probative value), such error was harmless. Given the overwhelming evidence of Chavez's guilt, on this record, there is no possibility that admission of the mattress contributed to the outcome of the proceedings. See Blackwood v. State, 777 So.2d 399, 408 (Fla.2000), cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001); State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).

Corpus Delicti for Sexual Battery
Chavez next claims that the trial court erred in denying his motion for judgment of acquittal as to the capital sexual battery charge because the State failed to prove the corpus delicti of the crime. The phrase "corpus delicti" refers to proof independent of a confession that the crime was in fact committed. See Schwab v. State, 636 So.2d 3, 6 (Fla.1994). Here, as in Schwab, we find this assertion unpersuasive.
In Schwab, the defendant had moved for judgment of acquittal on the murder, sexual battery, and kidnapping charges against him, arguing that the State had failed to prove the corpus delicti of those crimes independent of his statements. On appeal, Schwab argued that the trial court erred in denying those motions. In rejecting this argument, the Court articulated the general principles which govern a corpus delicti analysis:
The general order of proof is to show that a crime has been committed and then that the defendant committed it. Spanish v. State, 45 So.2d 753 (Fla. 1950); see State v. Allen, 335 So.2d 823 (Fla.1976). "But in many cases the two elements are so intimately connected that the proof of the corpus delicti and the guilty agency are shown at the same time." Spanish, 45 So.2d at 754. Thus, the "evidence which tends to prove one may also tend to prove the other, so that the existence of the crime and the guilt of the defendant may stand together and inseparable on one foundation of circumstantial evidence." Cross v. State, 96 Fla. 768, 780-81, 119 So. 380, 384 (1928). A defendant's confession or statement "may be considered in connection with the other evidence," but "the corpus delicti cannot rest upon the confession or admission alone." Id. at 781, 119 So. at 384. Before a confession or statement may be admitted, there must be prima facie proof tending to show the crime was committed. Frazier v. State, 107 So.2d 16 (Fla.1958); Cross; see Farinas v. State, 569 So.2d 425 (Fla.1990); Bassett v. State, 449 So.2d 803 (Fla.1984). Additionally, by the end of trial the corpus delicti must be proved beyond a reasonable doubt. Cross.

636 So.2d at 6. In applying these principles to the facts in Schwab, we stated:
The state's proof met these standards. The medical examiner testified that the victim died from manual asphyxiation, most probably by strangling or smothering. The victim's nude body and the clothes that had been cut off him were found concealed in a footlocker in a remote location. Cf. Stano v. State, 473 So.2d 1282 (Fla.1985), cert. denied, 474 U.S. 1093, 106 S.Ct. 869, 88 L.Ed.2d 907 (1986). A wad of tape also found in the footlocker yielded a fingerprint identified as Schwab's. Witnesses testified that Schwab rented and returned the U-haul truck. Although the victim may have gone willingly with Schwab initially, the conclusion that at some point he was held against his will is inescapable. Cf. Sochor v. State, 619 So.2d 285 (Fla.), cert. denied, 510 U.S. 1025, 114 S.Ct. 638, 126 L.Ed.2d 596 (1993); Bedford v. State, 589 So.2d 245 (Fla.1991), cert. denied, 503 U.S. 1009, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992). The details in *763 Schwab's statements correspond well with the physical evidence. Therefore, we hold that the state submitted sufficient proof of the corpus delicti to admit Schwab's admissions that he kidnapped and raped the victim. Moreover, all of the evidence proved beyond a reasonable doubt the corpus delicti of each of the charged crimes and that Schwab committed them.
The Schwab analysis is instructive in this case. Here, as in Schwab, the details in Chavez's confession "correspond well with the physical evidence." The victim a little boyhad disappeared months before his body was found, at a time when he had been expected to return home directly from school (suggesting that he was taken by an adult by force). The Scheinhaus property where Chavez lived was in the same general vicinity from which the little boy had disappeared. Mrs. Scheinhaus found a handgun which had been stolen from her in Chavez's trailer at the same time that she discovered the victim's book bag there. Both the gun and the book bag were found to have Chavez's prints on them, and the gun was positively identified as the murder weapon. From these facts, as in Schwab, "the conclusion that at some point [the child victim] was held against his will is inescapable."
The little boy, who died almost instantly from a gunshot wound, bled on the threshold of the horse farm trailer (which was situated in a remote location), suggesting that the murderer had stopped him as he tried to escape. As observed by the trial court here in making its ruling, "[t]he state established that the victim didn't know the defendant, and there was no reason for Jimmy Ryce to be alone with the defendant in a remote area of Dade County in a small trailer. There was no evidence that a ransom demand was ever made."
Jimmy's remains showed, significantly, that his pants were still unzipped. He was also otherwise partially unclothed, having one shoe off, and a sock missing, further suggesting that he had, at some point, been disrobed. A tube of lubricant matching the description Chavez gave in his final confession was recovered from the trailer where the victim died and admitted into evidence, providing additional corroboration of the details of Chavez's confession regarding the sexual battery.
On these facts, the trial court did not err in concluding that the State had submitted sufficient proof of the corpus delicti to admit into evidence Chavez's admissions that he had sexually assaulted the victim. The evidence proved beyond a reasonable doubt the corpus delicti of the sexual battery charge, and that Chavez committed it.

Cumulative Photos
Chavez claims that the trial court erred in admitting, over defense objection, cumulative gruesome photographs depicting the victim's remains. As stated by the Court in Henderson v. State, 463 So.2d 196, 200 (Fla.1985), "[t]hose whose work products are murdered human beings should expect to be confronted by photographs of their accomplishments." Here, the medical examiner testified that the photographs showing injury to the organs, and specifically to the heart, were not cumulative.[39] The doctor also explained the difference between Exhibits 22 and 29, refuting the suggestion that these photographs were cumulative. Thus, the record supports admission of the photographs as relevant and not cumulative. *764 In the Course of Kidnapping Aggravator
The trial court here denied Chavez's requested instruction on "doubling." Chavez asserts that the jury based its conviction for first-degree murder on the felony murder theory with kidnapping as the underlying felony; therefore, the penalty phase instruction regarding kidnapping allowed the jury to improperly "double" the same aspect of the crime. Additionally, Chavez maintains that the trial court erred in finding the "in the course of a kidnapping" aggravator in this case.
Here, Chavez was charged in the indictment with the offense of kidnapping Jimmy Ryce. As provided in section 787.01(1)(a)(2)-(3), Florida Statutes (1995), "[t]he term `kidnapping' means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to ... [c]ommit or facilitate commission of any felony," or to "[i]nflict bodily harm upon or terrorize the victim or another person." Further, under section 787.01(1)(b), "[c]onfinement of a child under the age of 13 is against his will within the meaning of this subsection if such confinement is without the consent of his parent or legal guardian."
In Faison v. State, 426 So.2d 963, 965 (Fla.1983), this Court adopted the test enunciated in State v. Buggs, 219 Kan. 203, 547 P.2d 720, 731 (1976), whereby, to sustain a conviction for kidnapping, the confinement (a) must not be slight, inconsequential and merely incidental to the other crime; (b) must not be of the kind inherent in the nature of the crime; and (c) must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection. In Faison, applying that test, the Court held that the defendant's act of moving one victim to the rear of an office and another victim from the kitchen to the bedroom was sufficient for a kidnapping conviction.
Here, the child victim was taken by an adult stranger at gunpoint to a remote trailer where his blood stains were later found. This conduct was obviously intended to facilitate the subsequent sexual battery, which could not have been so easily effected where Jimmy was abducted. Applying a Faison analysis, the jury could properly conclude that these facts were sufficient to support a kidnapping conviction. See also Ferguson v. State, 533 So.2d 763, 764 (Fla.1988) (recognizing that evidence that the victim was confined to make another crime substantially easier to commit is sufficient to support a kidnapping charge). Further, this Court's precedent has already resolved the "doubling" argument contrary to Chavez's position. See Hudson v. State, 708 So.2d 256, 262 (Fla.1998) (rejecting an argument that the "murder in the course of a felony" aggravator is an invalid automatic aggravator).

Avoiding Arrest Aggravator
Chavez argues that his death sentence should be reversed because the trial court erred in considering, and in instructing the jury that it could consider, as an aggravating factor that the murder was committed for the purpose of avoiding lawful arrest. The trial court, in its sentencing order, stated the following:
The totality of the circumstances of this case would suggest that the sole or dominant motive for the murder of Samuel James Ryce was the elimination of this witness. The defendant stated in his confession that while he intended to release the victim in a remote area of the county he was unable to do so because a helicopter was conducting a search of the area. The defendant stated that he believed that if he released *765 the victim at this time he would be caught. The defendant shot and murdered the victim when he attempted to escape from the trailer where he was being held captive. The evidence in this case clearly established that the defendant's sole motive for the murder for the victim was to eliminate the only witness of the kidnaping and sexual battery.
The Court finds that this aggravating circumstance has been proven beyond a reasonable doubt.
The correctness of the trial court's legal conclusion was confirmed not only by evidence establishing the circumstances of the victim's death, but by Chavez's own transcribed statement, in which he explained, "It was the only way that I had in order to avoidto prevent him from going out." Being amply supported by the record, the trial court's finding that the "avoid arrest" aggravator was established on these facts was not error.

Heinous, Atrocious or Cruel Aggravator
Next, Chavez claims that his death sentence should be reversed because the trial court erred in giving the "heinous, atrocious, or cruel" aggravator ("HAC") instruction. Here, the trial court found:
The evidence in this case established that the victim, Samuel James Ryce, was abducted at gunpoint by the defendant. The defendant approached the victim with a gun in his hand and asked him if he wanted to die. The victim became frightened and answered no and was then ordered by the defendant to get into his truck. The defendant then drove his vehicle to a trailer in a remote area of the county where he sexually battered Samuel James Ryce. After committing the sexual battery the defendant drove the victim to other locations before he finally returned the victim to the trailer. During this period of time the victim on at least two (2) occasions asked the defendant if he was going to be killed. The defendant, Juan Carlos Chavez, never told Samuel James Ryce that he was not going to die nor did he take any action to alleviate the victim's fear of death. In fact, the evidence revealed that the defendant played `mind games' with the victim by asking him what he thought the defendant could do with him. The defendant also stated that throughout this period of time the victim was constantly sobbing.
"For the purpose of this aggravator a common sense inference as to the victim's mental state may be inferred from the circumstances." Swafford, 533 So.2d at 277.[40] The victim was held captive by the defendant for over 3½ hours before he was killed. Based upon the evidence, there can be no doubt that Samuel James Ryce lived every minute of his last few hours of his life with the fear of death. This fear and emotional strain was willfully inflicted on this victim by the defendant and was unnecessarily torturous in nature.
As this Court stated in Swafford, 533 So.2d at 277 (additional citations omitted):
In numerous cases the Court has held that this aggravating factor could be supported by evidence of actions of the offender preceding the actual killing, including forcible abduction, transportation away from possible sources of assistance and detection, and sexual abuse. In Parker v. State, 476 So.2d 134, 139 (Fla.1985), we quoted the statement in Adams v. State, 412 So.2d 850, 857 (Fla.), cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982), that "fear and emotional strain preceding a victim's almost instantaneous death may be considered as contributing to the heinous nature of the capital felony." Moreover, the victim's mental state may *766 be evaluated for purposes of such determination in accordance with a commonsense inference from the circumstances. Preston v. State, 444 So.2d 939, 946 (Fla. 1984) ("victim must have felt terror and fear as these events unfolded") (emphasis added).
Here, as in Swafford, factors based on events preceding the shootingabduction, fear, mental anguish, and sexual abuse support the trial court's finding of HAC.

Diminishment of Jury's Role in Sentencing
Chavez argues that the prosecutor improperly diminished the jury's role in making a sentencing recommendation during both voir dire[41] and the penalty phase[42] of the trial. However, during voir dire, when a juror suggested that the advisory recommendation "[took] a burden off" him, the trial court immediately, and properly, informed the jury that it would give great weight to any advisory sentence recommended.[43]
On this record, viewing the totality of the circumstances (including the trial court's curative instruction), the jury's role in sentencing was not impermissibly diminished. It was told that its recommendation would be advisory, and given great weight. This correctly states the law in Florida. See generally Grossman v. State, 525 So.2d 833, 839-40 (Fla.1988).

Proportionality and Remaining Claims
Consistent with our mandate, we have conducted a proportionality review in this case, and determined that, here, the death penalty is appropriate and proportional.[44]Cf. Wike v. State, 698 So.2d 817, 823 (Fla.1997) (holding death sentence proportional *767 for kidnapping and murder of a six-year-old child committed concurrently with the kidnapping, attempted murder, and sexual battery of her eight-year-old sister, where CCP and committed-to-avoid-arrest aggravators were proven); Schwab, 636 So.2d at 7 (holding death sentence proportional for kidnapping, murder, and sexual battery of a thirteen-year-old boy, where prior conviction of violent felony, felony murder and HAC were proven); Carroll v. State, 636 So.2d 1316 (Fla.1994) (holding death sentence proportional for strangulation murder and sexual battery of child victim). We reject without discussion Chavez's remaining claims.[45] On rehearing, Chavez has asserted that Florida's capital sentencing scheme violates the United States Constitution under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla. 2002), and King v. Moore, 831 So.2d 143 (2002), and denied relief. We find that Chavez is likewise not entitled to relief on this claim.

CONCLUSION
In summary, we affirm Chavez's first-degree murder conviction and sentence of death. We also affirm Chavez's convictions and sentences for kidnapping and sexual battery.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
ANSTEAD, C.J., concurs in result only as to conviction, and concurs as to sentence.
SHAW and PARIENTE, JJ., concur in result only.
NOTES
[1] The parties did not dispute that Jimmy Ryce died there, and the State introduced evidence that a spot of the child's blood was found on the floor of the trailer.
[2] Jimmy Ryce's name appeared on several notebooks and a science book found in the backpack.
[3] The record reflects that, on the evening of December 7, Chavez commenced making a written statement, which he concluded at about 12:24 a.m. on December 8. He then received a restroom break and was offered a pillow and blanket, which he declined. Chavez returned to the interview room, where, without interruption by any interrogation, he slept or rested with the lights out until about 7:30 a.m. At that time, Chavez was awakened, provided with another restroom break, and fed breakfast before traveling to the horse farm property and the Scheinhaus property in the southern portion of Miami Dade County, accompanied by the police officers, at about 9:25 a.m.
[4] Estopinan testified: "During what's called the preinterview such as in this case, what we do is we receive the information from the person we are speaking to and we document the information on to a note pad. Eventually we do our report which is consistent with the notes."
[5] Forensic serologist Theresa Merritt of the Metro Dade Police Department testified that she received some items for examination on December 8, 1995. Merritt tested Jimmy's shorts for the presence of semen. The shorts "had a very bad odor, and they were very obviously biologically contaminated." "When an item is badly decomposed, the test we conduct for the presence of semenwe're looking for what is called an enzyme. This is a protein substance that doesn't last very long. And under circumstances like that, I would not really expect to find it." Merrit found no semen on the decomposed shorts.
[6] The responses which Chavez indicated Jimmy made contained factual information consistent with facts to which Mrs. Ryce testified at trial.
[7] As Chavez explained [transcribed statement]: "It was the only way that I had in orderI'm sorry. It was the only way that I had in order to avoidto prevent him from going out." Chavez stated that Jimmy "screamed, apparentlyor, well, certainly because of the impact of the bullet."
[8] Ms. Scheinhaus testified that Chavez had prepared planters with concrete in them that were placed on her property. She assumed that this was done to keep the horses from eating her hedges.
[9] Chavez later testified at trial that he had read the Miranda warnings, but had signed the consent to search without reading it.
[10] She observed: "He seemedhe seemed fine. He was calm. He spoke very clearly, veryhe expressed himself very clearly. He spoke very clearly. He spokehe actually spoke very well. That's another thing that I always remembered. He expressed himself in very correct Spanish. He was calm. He spoke slowly."
[11] The transcription of Chavez's final confession was completed after he had been with the police officers for a period of about fifty-two hours (including numerous breaks, Miranda warnings, at least two trips to the southern part of Miami Dade County where he walked freely around the property investigated, and one period of sleep). Defense counsel objected to the statements based on grounds stated in the pretrial motion to suppress. Chavez also objected to the statements on corpus delicti grounds.
[12] FBI Special Agent Russell testified that he was present when Metro Dade officers questioned Chavez. He stated that he did not observe Chavez mistreated in any way.
[13] Detective McColman testified that he locked the book bag in Sergeant Smith's desk for approximately two hours. However, the book bag and its contents were never brought into contact with Chavez, or placed in the same room with him.
[14] Mathews testified:

In the Caucasian population, the parentage index is 2,350,059,902 to 1. And basically what that number means is that it's just over two billion times more likely that the blood sample on the floor originated from a child of Don and Claudine Ryce than from some random couple in the population, in the Caucasian population.
Expressed another way, the probability of parentage was "99.99 percent."
[15] Over defense objection, the State introduced into evidence a bloodstained mattress found in the avocado grove trailer. (State's Exhibit 136.) Testing showed that the blood did not belong to either Jimmy Ryce or Chavez. The judge instructed the jury that the mattress was being admitted "for the limited purpose of showing that the stain on that exhibit is not related to this case, and specifically that the source of that stain is unknown, and that Samuel James Ryce and Chavez have been excluded as the source of that stain."
[16] Photographs of the planters and their contents were received into evidence and displayed to the jury. (State's Exhibits 103-107.)
[17] The planters were marked "A," "B" and "C." The skull, the remains of the left lower extremity and a left sneaker were found in planter "A." In planter "B," the right lower extremity was found with attached pelvis and clothing. "There was also a portion of vertebral column and also portions of pelvis as detached from the body." In planter "C," they found "the chest with the arms attached and the chest was clad in a T-shirt."
[18] In addition to showing that only one shoe was on, and one sock was removed, the photographs revealed that Jimmy's pants were unzipped.
[19] Chavez objected to the gruesome photographs as cumulative and unduly prejudicial. The doctor's photographs showed the heart exposed by the doctor, a metal probe which had been run through the body to demonstrate the actual path of the bullet, and pictures of a bush hook (a heavy chopping instrument, like an axe or machete, with a thicker blade) shown alongside severed body parts. This objection was overruled.
[20] Answering a hypothetical question, the medical examiner testified that the gunshot pathway observed on Jimmy's remains was consistent with a child who is fifty-five inches tall having been shot by someone who was falling or who had fallen and was shooting up towards the victim.
[21] Forensic serologist Theresa Merritt of the Metro-Dade Police Department examined the bush hook, but found no evidence of blood or tissue on it.
[22] United States Immigration and Naturalization Service documents reflected that Chavez never disclosed his alleged political activities to authorities upon his arrival in the United States. Chavez's childhood friend, Pedro Caballo, also testified (during the penalty phase) that Chavez never talked about politics, complained about the Cuban government, or expressed dissatisfaction with it.
[23] Chavez testified that there was a key to the horse ranch which hung in the Scheinhauses' kitchen. He stated that, on September 11, 1995, he had come to the horse ranch, and seen Ed Scheinhaus's car parked there. He heard a soundnot like a gun shot, but like a door closingcoming from the trailer. He went in to find the boy's body on the floor and Ed in a panic. Chavez saw that the boy was dead, and wanted Ed to go to the police or the hospital. Ed explained that it was an accident, that the boy had wanted to escape, and that Ed had gotten tangled up in clothes by the bathroom, or had fallen, and had shot the boy to prevent his leaving. Chavez did not know why Ed had the boy. After Ed prevailed upon Chavez to help him put the body into the truck, Ed drove off in the truck. Chavez assumed that he was going to report the matter to the authorities.

Chavez got into Ed's Acura and pushed the seat back to accommodate his height (he is taller than Ed). At that time, he saw the gun under the seat, and handled it. He had used this gun for target practice before, and kept bullets which could be used with the gun in his own trailer. Those .38 bullets had been found during the aftermath of Hurricane Andrew, when various belongings from the home were being salvaged. Although Chavez did not keep the gun, he thought he could use the bullets for some future target practice, when permitted to use the gun.
Chavez drove to the Scheinhaus residence, and was surprised to find Ed. Ed told him that he had to help dispose of the body, or Ed would tell authorities that Chavez had already helped, and he would be deported. They put the body into Chavez's disabled van. A fewdays later, without explanation, Ed told Chavez that he had taken care of everything. Chavez suspected that Ed had put the body into the planters.
[24] Chavez's trial testimony was rife with inconsistencies, both with his own prior statements, and with evidence properly admitted at trial. He had earlier told Diaz that he had removed the gun from a kitchen cabinet in Mrs. Scheinhaus's residence, and had it with her permission, because he believed it was his duty to protect the property. At trial, he claimed to have used the gun for target practice while it was in Danny Frometa's possession. Mrs. Scheinhaus testified, however, that the last time she saw her handgun, it was in her underwear drawer.

Further, the medical examiner's testimony reflected that the victim would have died almost instantaneously from the gunshot wound, yet Chavez did not testify that he saw Ed outside the trailer as he drove up to it, or that Ed had the gun in his hands when Chavez entered the trailer, or at any other time during the period when Chavez was purportedly working with Ed to help dispose of the victim's body. Rather, he testified that Ed was holding rags, which the two of them used to cover the body prior to loading it into the truck; and that, immediately thereafter, Ed sped off in the truck. While Chavez claimed to have found the gun later under the driver's seat of the Acura, there is no accounting for how the gun got from the trailer to the car, nor any opportunity, under Chavez's trial version of the facts, for Ed to have placed it there after Jimmy was instantaneously killed. Lastly, the testimony of both Ed and his parole officer reflected that Ed was under house arrest on the day that Jimmy died, reporting in electronically on a regular basis.
[25] Chavez recounted additional instances of mistreatment by the police which allegedly occurred during his questioning. He claimed that an officer slapped him on the back of the head with his fingertips, and ignored him when he said he was tired. At one point, when Chavez was sitting on the floor to stretch his legs, Detective Diaz allegedly came into the room, slammed a brown leather jacket on the table, and told Chavez to "put your ass on that fucking chair." He asserted that the officers told him that they would "get the truth out of me whether it was by pulling my tongue out in pieces or squeezing my nuts, that tougher men than me have gone through that chair, and at the end they were all wound up as shit. He couldn't get anything out of me. He was not about to leave me free on the streets either, that he was going to take the pleasure of sending my ass back to Cuba and that Castro would take care of me. They don't want queers in this country, all those types of things that were going on." Chavez also claimed that he was given a bagel and a cup of coffee on a poster bearing Jimmy's likeness, and asked if he had "any balls for eating while you're looking at his face."
[26] This assertion is inconsistent with photographs of Chavez taken when he was later showing the police detectives various places on the Scheinhaus property, which photos reflect that Chavez was wearing his watch at that time.
[27] On cross examination, Chavez was confronted with one of the documents which he had personally signed and dated during questioning.
[28] He stated that, at first, he told the officers a lie, thinking that, when they discovered it was false, they would know that he knew nothing about the case. Chavez claimed that, when he eventually tried to tell Estopinan about Ed Scheinhaus, Estopinan stormed off, unwilling to listen.
[29] Chavez denied being a homosexual. He said that he had made up a story about his homosexual lover "Ivan" being involved in Jimmy's disappearance because the police thought that another person must be involved, and had told him, in their experience, there were only three motives for kidnapping and killing a child: accident, ransom, and sexual molestation.
[30] Officer Diaz (who had purportedly slammed his brown leather jacket on the table) testified that he did not, at any time, own a brown leather jacket, and had not slammed one on the table during Chavez's questioning.
[31] Although, upon careful review, we conclude that the length of interrogation here did not coerce Chavez's confession, we nonetheless emphasize the importance of providing detainees in the criminal justice system both a probable cause determination and a first appearance within the time constraints established by rules 3.130 and 3.133 of the Florida Rules of Criminal Procedure.
[32] Estopinan testified that, although he suspected that Jimmy Ryce was dead, he was not certain of that fact when questioning Chavez. He testified that, just prior to Chavez's last confession, "I felt that it was time for him to be truthful and tell us what really happened to Jimmy, and I went back and began to ask him about Jimmy and where Jimmy was located. We wanted to find Jimmy." Officer Michael Malott testified that the detectives were concerned that Chavez had provided information regarding Jimmy's death: "[M]y concerns were that he had made admissions to a crime that we had not been able to disprove, and my concerns were we wanted to continue our investigation in hopes of detectives looking for or actually finding Jimmy Ryce and getting truthful information."
[33] The Supreme Court has specifically declined to address the issue of whether a confession which is voluntary under the Fifth Amendment must be suppressed where a McLaughlin violation has occurred. See Powell v. Nevada, 511 U.S. 79, 85, 114 S.Ct. 1280, 128 L.Ed.2d 1 (1994) (declining to address the issue); but cf. id. at 89, 114 S.Ct. 1280 (Thomas, J., joined by Rehnquist, C.J., dissenting) (reasoning that the defendant's statement in that case should not be suppressed "because the statement was not a product of the McLaughlin violation").
[34] On December 7, 1995, at approximately 1 p.m., four K 9 dogs were taken to the Scheinhaus property to search for Jimmy's remains. Two dogs alerted, showing basic interest in the cement planters located near the horse stables. Additionally, the medical examiner testified that, when he was on the Scheinhaus property on December 8 at about 12 noon, he thought the concrete-filled planters looked suspicious, expressing his concerns at that time that the planters might contain the remains of a body.
[35] The defense maintained that Chavez was taken into custody at 7:35 p.m. on December 6. Detective Estopinan testified that, although Detective Piderman had interrupted this discussion with Chavez at 4:30 p.m. on December 8 with an affidavit waiving Chavez's first appearance, because Chavez was emotional and talking about having been sexually battered by a relative in Cuba, Estopinan decided to let Chavez finish talking before they discussed the waiver. This occurred at 6:30 p.m., at which time Estopinan told Chavez of the right to appear before a judge within twenty-four hours; that, during this hearing he would be advised of any charges against him; that he would have a right to meet with his family, friends or others he wished to see; and that he would be entitled to speak with an attorney. Estopinan testified that he asked Chavez if he would be willing to forego the hearing, and Chavez agreed. Chavez then signed the waiver of first appearance form at 6:50 p.m.
[36] Some courts have applied a "voluntariness" test in determining whether a confession must be suppressed in light of a McLaughlin violation. See United States v. Perez-Bustamante, 963 F.2d 48, 51-54 (5th Cir.1992); State v. Tucker, 137 N.J. 259, 645 A.2d 111, 117-19 (1994).
[37] Other jurisdictions have rejected the "voluntariness" test, applying a "fruit of the poisonous tree" analysis to determine whether a confession obtained during an illegal detention must be suppressed. See State v. Huddleston, 924 S.W.2d 666, 673 (Tenn.1996) (citing Williams v. State, 264 Ind. 664, 348 N.E.2d 623, 629 (1976), and Black v. State, 871 P.2d 35 (Okla.Crim.App.1994)).
[38] Chavez had stated in his confession that, in sexually assaulting Jimmy, he had used a tube of lubricant containing blue lettering on it which he had found in the horse farm trailer. A bottle of water-based lubricant was recovered from the horse farm trailer and received into evidence without objection as State's Exhibit 139.
[39] The medical examiner testified:

Well, first of all, there are no photographs duplicative of 22 and there are no photographs duplicative of 24. In terms of 21, I can see some of the injuries in 24 as shown in 21; however, it's out of sequence in terms of my explanation that I've aligned in these slides. So it would be kind of out of sequence to take that out. It's also a much further distance as shown in 24.
[40] Swafford v. State, 533 So.2d 270 (Fla. 1988).
[41] During voir dire questioning, the following exchange occurred:

MR. BAND: Well, I'm not sure that I follow that. In a sense, you are correct. Ultimately, the Judge makes the decision. And as he has told you, he gives the jury's recommendation great weight. He looks to the jury for advice. You sit as an advisory board to the Court, if you will. Does thatI kind of get the drift, I guess, that that produces on you or places upon you some burden you feel uncomfortable with?
JUROR 991: No, just the opposite. I feel like it takes the burden off of me, because ultimately
[42] During closing argument of the penalty phase, the prosecutor stated:

Remember, again, you are not asked to pass sentence. That is solely the burden of the Court, and this Court alone. The Court will weigh your recommendation
[43] The trial court advised the panel:

Ladies and gentlemen, I just want you to understand that whatever recommendation you make, I give great weight to that recommendation. And I must underline "great weight." So it's not a situation where you can sit here as jurors and say, well, it doesn't matter what we do, because it's going to be the judge making the decision.
[44] The trial court found the following aggravators: (1) that a capital felony was committed while the defendant was engaged in the commission of or in an attempt to commit or escape after committing the crime of kidnapping; (2) that a capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (3) that the capital felony was especially heinous, atrocious or cruel. The trial court found the following statutory mitigators, according them the weight indicated: (1) the defendant's family background and good family relationship (some weight); (2) the defendant's political and economic background (little weight); (3) the defendant's good work record and ability to work and earn a living (some weight); and (4) the defendant's ability to establish and maintain positive and helping relationships (some weight). The trial court also found the following nonstatutory mitigators, according them the weight indicated: (1) the defendant's good jail conduct and courtroom demeanor (very little weight) and (2) the defendant's lack of a prior history of violence (some weight). After delineating these factors, the trial court stated:

This Court finds that the quality of the aggravating factors in this case greatly outweigh the mitigating circumstances. The strength of the aggravating circumstances in this case are so overwhelming that they make the mitigating circumstances appear insignificant by comparison.
[45] These are: (1) The death penalty is unconstitutional. See Ferguson v. State, 417 So.2d 639, 641 (Fla.1982) ("The death penalty in Florida as prescribed in section 921.141, Florida Statutes (1977), has been upheld repeatedly against arguments that it constitutes cruel and unusual punishment or violates the constitutional guarantees of equal protection and due process."). (2) Section 921.141(7), Florida Statutes (1995) (permitting victim impact evidence in a capital sentencing proceeding) is unconstitutional. See Payne v. Tennessee, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (finding that victim impact evidence is not offered to encourage a comparison of victims but to "show instead each victim's `uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be."); Burns v. State, 699 So.2d 646, 653 (Fla.1997) (rejecting challenges to the victim-impact statute based upon claims that it violates the prohibition against ex post facto laws, improperly regulates practice and procedure, allows admission of irrelevant evidence which does not pertain to any aggravator or mitigator, and violates equal protection because it may encourage the jury to give different weight to the value of different victims' lives); see generally Windom v. State, 656 So.2d 432, 438 (Fla.1995) (reflecting that "[this] evidence must be limited to that which is relevant as specified in section 921.141(7)"), cert. denied, 516 U.S. 1012, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995).